FILED

THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
P. GREG PARHAM
Special Assistant United States Attorney
Asset Forfeiture Section
United States Attorney's Office
California Bar No. 140310
    U.S. Courthouse, 14th Floor
    312 N. Spring Street
    Los Angeles, CA 90012
    Telephone: (213)894-0304
    Facsimile: (213)894-7177
    E-Mail: greg.parham@usdoj.gov

Attorneys for Plaintiff
United States of America

2008 APR 24  PM 12: 54

CLERK U.S. DISTRICT COURT
CENTRAL DIST. G  CALIF.
LOS ANGELES

BY _____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>           v.<br><br>$180,920.46 IN VARIOUS BANK FUNDS,<br><br>                Defendant. | NO. CV08-02703 PA (AGRx)<br><br>VERIFIED COMPLAINT FOR FORFEITURE<br><br>[18 U.S.C. §§ 981 (a)(1)(A) & (C)]<br><br>[U.S. Secret Service] |

The United States of America brings this claim against the defendants $21,452.82 in Washington Mutual Bank ("WAMU") account funds, $152,000.00 in WAMU account funds, $2,467.64 in Golden 1 Credit Union ("Golden") account funds, and $5,000.00 in Altura Credit Union ("Altura") account funds (collectively referred to

1  hereafter as "defendant bank funds"), and alleges as follows:

2  JURISDICTION AND VENUE

3  1.    This is a civil forfeiture action brought pursuant to 18

4  U.S.C. §§ 981(a)(1)(A) & (C).

5  2.    This court has jurisdiction over the matter under 28

6  U.S.C. §§ 1345 and 1355.

7  3.    Venue lies in this district pursuant to 28 U.S.C.

8  § 1395(b).

9  PERSONS AND ENTITIES

10  4.    The plaintiff is the United States of America.

11  5.    The defendants are: a) $21,452.82 in WAMU account funds,

12  seized from checking account number XXXX-XXXXXXX618-4, held in the

13  name of Qualitytel, Inc.; b) $2,467.64 in Golden account funds,

14  seized from checking account number XXXXXX9240, held in the name of

15  Sharlene and Louis Arriola; c) $152,000.00 in WAMU account funds,

16  seized from checking account number XXX-XXX248-8, held in the name

17  of Sharlene Arriola; and d) $5,000.00 in Altura account funds,

18  seized from account number XXX9507, held in the name of Jadyn

19  Arriola.  The defendants were seized on or after December 15, 2006

20  pursuant to a seizure warrant issued by the Honorable United States

21  Magistrate Judge Patrick J. Walsh on December 15, 2006.[1]

22  6.    The interests of Louis Arriola, Sharlene Arriola, Jadyn

23  Arriola, and Qualitytel, Inc. may be adversely affected by these

24  proceedings.

25  7.    Plaintiff alleges that the defendant bank funds represent

26  or are derived from proceeds traceable to violations of 18 U.S.C.

27

28  [1]  The account numbers have been redacted pursuant to Local Rule
79-5.4(d).

2

§§ 1343 (wire fraud), 1341 (mail fraud), and/or 1028(a)(7) (identity theft), or a conspiracy to commit one or more of those offenses. Each of these offenses constitute "specified unlawful activity" pursuant to 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B). The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). There is also probable cause to believe that the defendant bank funds were involved in one or more monetary transactions involving proceeds of the above violations, which transactions were designed to promote the carrying on of specified unlawful activity, or to conceal or disguise the true nature, source, location, ownership or control of the proceeds in violation of 18 U.S.C. § 1956(a)(1)(i) and (B), thus providing a separate basis for forfeiture under 18 U.S.C. § 981(a)(1)(A).

8.    The defendant bank funds are currently in the custody of the United States Department of Treasury, where they shall remain subject to this court's jurisdiction during the pendency of this action.

9.    Pursuant to 18 U.S.C. § 983(a)(3)(A)-(C), the deadline for filing a civil forfeiture complaint against the defendant bank funds was on or before May 30, 2007, but the court granted the parties' stipulation and requests to extend the complaint filing deadline until April, 2008.

<u>EVIDENCE SUPPORTING FORFEITURE</u>

*Overview of Fraudulent Telecommunications Schemes*

10.    Telecommunications subscription fraud and call sell fraud operates as follows:

a.    Members of the fraud ring apply for and receive

3

telecommunications service from victim telecommunications companies/providers ("victim providers") through normal application procedures of the victim providers or of third party sales agents.

b.   Often, the fraud ring steals the identities of real companies and the identities of actual company officers to facilitate the process of applying for and obtaining telecommunications service from a victim provider. The fraud ring may also use names of fictitious individuals, along with the name of the real company, when communicating with the victim provider.

c.   The victim providers, believing they have a legitimate customer, install service at a physical address designated by the fraud ring which the fraud ring then uses as a call forwarding facility.

d.   The fraud ring receives the telecommunications service at the call forwarding facility but does not intend to pay the victim providers for the service it receives.

e.   The fraud ring then resells the telecommunications service received from the victim providers to the fraud ring's own clients at very low rates. The fraud ring's clients may include call brokers or least cost route ("LCR") providers.[2]   Since the fraud ring has no

---

[2]   Least cost routing ("LCR") is the process in the voice telecommunications industry that provides customers with cheap telephone calls. Telecommunications providers compare between and choose the best routes and services from numerous telephone service providers/suppliers for multiple worldwide locations.

intention of paying the victim providers, it can afford to resell the service at low rates and the fraud ring profits from any money received from its own clients.

f. Calls from the fraud ring's clients are routed through the call forwarding facility using the service connections and infrastructure installed by the victim providers.

g. The victim providers are not aware the telecommunications service they are providing to the fraud ring at the call forwarding facility is being resold to, and used by, third parties.

h. The victim providers typically discover the fraud only after there has been high volume usage of their telecommunications service in a relatively short period of time. By that time, the fraud ring may have already abandoned the call forwarding facility used to receive telecommunications service, and moved on to new locations and new victims.

i. Both the telecommunications fraud and identity theft of the real company and its officers are discovered when the victim providers attempt to collect on their bill and learn the real company never applied for service.

j. The victim providers suffer a large monetary loss since they never receive payment for the telecommunications service they provided to the fraud ring.

_____

This is done on a weekly or even daily basis in order to maintain a competitive cost base and acceptable call quality.

*Overview of Telecommunications Fraud Committed by Louis Arriola*

11.  In response to calls from victim companies, the Los Angeles Field Office of the United States Secret Service ("USSS") investigated Louis Ricardo Arriola, the self-employed president of a company named Qualitytel, Inc. ("Qualitytel"), which Louis Arriola incorporated in 2003 and listed a business address on Dill Circle, in Corona, California 92879 (the "Dill Circle address").

12.  Since approximately February 2006, Louis Arriola and other known and unknown co-conspirators had been impersonating an officer of Saint Gobain Corporation [Gordon R. Schmitt ("Schmitt")], to receive telecommunication services at a commercial address in Upland, California.  Saint Gobain is headquartered in Valley Forge, Pennsylvania, and had not entered into any telecommunications service contracts for a location in Upland, California.

13.  In March 2006, Arriola and other known and unknown co-conspirators, claiming to be Schmitt, rented office space in Upland, California to use as a call forwarding facility.  These co-conspirators then applied for telecommunication services from several different victim companies, including Linkline Communications Inc. ("Linkline") and Transnational Communications International ("TNCI").  In each instance, applications were submitted in the name of "Gordon Schmitt" of Saint Gobain and the companies were directed to install telecommunication services at the Upland office address.

14.  Three witnesses identified Louis Arriola as the man they had known as "Gordon Schmitt" of Saint Gobain, namely Ying Chun ("James") Chui, the landlord of the Upland office building, his

6

1 wife and co-owner Bing Zhao, and Renato O'Neal, Director of Sales
2 for victim telecommunications provider Linkline.

3    15.  Louis Arriola was also captured on WAMU surveillance
4 videos, where he purchased money orders to pay for the initial
5 installation fees for telephone service from victim provider TNCI.

6    16.  Louis Arriola's company Qualitytel received $677,623.57
7 in payments from its own clients for services believed to be routed
8 through the Upland office, including telecommunications company Wyn
9 International and known LCR companies such as Universal Gateway
10 LLC.   LCRs sell telephone service directly to customers. USSS
11 investigation indicated that these companies purchased telephone
12 service from Qualitytel and resold the services to end users.

13    17.  Although Qualitytel contracted for telecommunications
14 services from a total of five victim providers in the name of
15 Schmitt, Qualitytel did not pay for the services received at the
16 Upland office address.   In total, the estimated loss from this
17 scheme was believed to be $1,400,382.06.  As set forth below, some
18 of the funds generated in this illegal activity by Louis Arriola
19 were deposited into bank accounts held by Qualitytel, Louis
20 Arriola, his wife, Sharlene Arriola, and his daughter, Jadyn
21 Arriola.

22 *USSS Investigation of Louis Arriola and Qualitytel*

23    18.  On May 4, 2005, USSS SA Mark Buenaluz met with Ceres
24 Fagan, Director of Fraud and Network Security for Telepacific, who
25 showed him copies of company documents and told him the following:

26    a.  From October 28, 1999 to about September 27, 2001, Louis
27         Arriola was employed at Telepacific in the sales
28         department.  His job, as a sales agent and subsequently

7

1    as a manager, was to sell domestic and international
2    telephone service to corporate customers.

3    b.   In 2001, Louis Arriola claimed to be selling Telepacific
4         services to three companies located in the Los Angeles
5         area.  He submitted three applications to Telepacfic in
6         the name of actual companies indicating that these three
7         clients had agreed to purchase telephone services from
8         Telepacific.  However, when Telepacific attempted to
9         collect payment from these three companies, they
10        discovered that the companies had never contracted to
11        purchase services from Telepacific.

12   c.   As a result of Louis Arriola's false representations
13        regarding these three companies, Telepacific suffered a
14        loss of approximately $190,000.

15   d.   After conducting an internal fraud investigation,
16        Telepacific terminated Louis Arriola's employment on or
17        about September 27, 2001.

18   19.   On December 7, 2005, SA Buenaluz spoke to Shelli Marie
19   Pelly, who in 2001 was the Regional Director of Sales at PacWest
20   Telecom Corporation ("Pac West").  She informed him after Louis
21   Arriola left Telepacific in 2001, he was hired as branch manager of
22   the Pac West Burbank office, where he worked managing the sales of
23   telecommunications services to corporate customers.  Louis Arriola
24   was terminated after about two months of employment for suspected
25   fraud.  In July 2006, the Pac West Human Resources Department
26   verified Louis Arriola was employed from October 1, 2001 through
27   November 10, 2001.

28   / / /

*Arriola Leases Office Space to Be Used as a Call Forwarding Facility*

20.   On July 7 and 24, 2006, USSS SA Prieto and SA Buenaluz met with Ying Chun ("James") Chui, property owner and manager of an office building on Third Ave, in Upland, California 91786, who told them the following:

a.   Since approximately March 2006, Chui leased office space (Suite I) at the Third Ave location in Upland, California 91786 to a person who claimed to be Schmitt, Vice President of Saint Gobain Corporation.

b.   Chui had been in contact with Schmitt at the telephone number (213) 281-1024.

c.   Chui met personally with Schmitt on approximately three occasions and called him at the telephone number (213) 281-1024 when there was a need to talk to him about the leased office, Suite I.

d.   Chui met Schmitt inside of the office space (Suite I), and saw electronic equipment on a desk with wires extending from the equipment leading up to the ceiling.

e.   Chui thought Schmitt's business was unusual, because unlike other tenant offices, he did not see any documents, paperwork, or similar items a business would have and the electricity bill for the building was much higher once Schmitt moved into Suite I.

f.   Chui had seen Schmitt drive a newer model black Mercedes to his (Chui's) house and had seen the same vehicle parked across the street from the leased office space (Suite I).

21. Continuing on July 7, 2006, Chui positively identified Louis Arriola from a photo line-up as the person who presented himself and signed a lease agreement as Schmitt. Chui also said the person whose photograph he identified as Schmitt was the person he had called and had spoken with at the telephone number (213) 281-1024.

22. On July 24, 2006, USSS SA Huang and SA Buenaluz met Chui in Hacienda Heights, California, and showed him a photograph of Louis Arriola's vehicle. Chui told them the photograph of the vehicle looked like the Mercedes Benz he had seen Schmitt drive.

23. On October 4, 2006, SA Buenaluz learned from documents and surveillance footage from WAMU that on August 7, 2006, Michael Peterson had cashed a check drawn on WAMU account number XXXX-XXXXXXX618-4, held in the name of Qualitytel, Inc. On that same day, Michael Peterson made a "cash" payment to Chui's bank account for $1,500, an amount which was equal to the monthly rental fee for Suite I.

24. On October 31, 2006, SA Buenaluz learned from Chui that the person he had known as "Gordon Schmitt" had vacated Suite I. Chui informed SA Buenaluz that a search warrant had been executed at the Third Ave office complex in early September. To his knowledge, Suite I had not been the subject of the search.

25. On November 3, 2006, USSS SA Katherine Peterson and SA Buenaluz interviewed Bing Zhao, who co-owns the office complex at N. Third Ave in Upland with her husband Chui. Zhao told them the following:

a. In September 2006, a tenant had informed her husband that the police were at the Third Ave office complex executing

10

1    a search warrant.  At that time, they did not know which
2    office suite had been searched.

   b.  On September 10, 2006, Zhao went to the Third Ave office
3        complex at her husband's request to look for any damage
4        caused by the police.
5

   c.  On September 10, 2006, Zhao checked the door to Suite I,
6        opened the door, found it undamaged, and saw that the
7        office was empty.  The table and equipment which she had
8        previously seen were gone.  The wires leading from the
9        equipment up to the ceiling were also gone.  Since the
10       office was empty, and because she had not recently seen
11       Schmitt, Zhao believed he may have moved out of the
12       building.
13

   d.  Zhao did not need to clean out Suite I for a new tenant
14       because Suite I was completely empty; there was no trash,
15       furniture, boxes, documents, files, or anything else
16       inside.
17

   e.  Around the middle of October, Chui and Zhao leased Suite
18       I to a new tenant.
19

   f.  "Schmitt" had paid the lease for Suite I through the end
20       of October 2006 and had entered into a three-year lease
21       that would have expired in 2009.
22

23  26.  Continuing on the same date, Zhao positively identified
24  Louis Arriola from a photo line-up as the person she knew as
25  Schmitt.

26  *Victim Linkline Provides Service for "Gordon Schmitt" at Suite I*
27       27.  On August 7, 2006, USSS Criminal Research Specialist
28  (CRS) Margie Martinez gave SA Buenaluz information from the pen

register installed on telephone number (213) 281-1024 to a company called Linkline, on S. Milliken Ave, in Ontario, California 91761.

28.   On August 8, 2006, Federal Bureau of Investigation SA Abelon and SA Buenaluz went to Linkline's office and met with Renato O'Neal, Director of Sales, who told them the following:

     a.   O'Neal recently conducted business with a person named Schmitt who claimed to be the Vice President of Information Technology for the Saint Gobain company. O'Neal met Schmitt in person at Linkline and managed the account personally.

     b.   Schmitt communicated with him by e-mail using the e-mail address "gschmitt@saintgobaininc.com" and telephone number (213) 281-1024.

     c.   A one page Saint Gobain Credit Information sheet was provided to Linkline together with an application for credit.

     d.   Schmitt said he wanted to set up service as quickly as possible, and wireless technology service was installed in Suite I at the Third Ave office complex in Upland.

     e.   Before service with Linkline was installed, O'Neal met with Schmitt inside of Suite I.  The office was small and contained approximately four servers and one Cisco router positioned on top of a foldout table, with connections leading up the wall from the servers and router.

     f.   Based on O'Neal's experience, it appeared that there was already some active telecommunications service in place. There appeared to be approximately eight PRI network

1          channels installed.[3]

2     g.   While he was in the office, Schmitt made an outgoing

3          telephone call to a business associate and began the

4          conversation with the statement, "this is Gordon."

5     h.   Schmitt drove a newer model Mercedes Benz, possibly a

6          model C230 four door sedan, silver in color.   This

7          vehicle was parked in front of the office building when

8          he met with Schmitt.

9     i.   Sometime between June 20 and 23, 2006, Schmitt went to

10         Linkline's office in Ontario and made a cash payment of

11         $2,299.00 towards the Saint Gobain account.

12    j.   When service was initially put on line, the amount of

13         data passing through the Saint Gobain service account was

14         of such a high volume that it interfered with the service

15         of other Linkline customers and bumped them off.

16    k.   On July 7, 2006, Schmitt requested removal of the

17         wireless equipment installed on the roof of the office

18         building.  The equipment was removed on July 12, 2006.

19    l.   On Sunday, August 6, 2006, O'Neal received four telephone

20         calls to his office telephone number and one telephone

21         call to his cell phone from Schmitt's number (213) 281-

22         1024.   Schmitt said he was calling from New York and

23         wanted O'Neal to know he would send payment to Linkline

24    _____

25    [3]  A primary rate interface ("PRI") is a telecommunications
      standard used on T-1 lines for carrying voice and data
26    transmissions between two physical locations.   PRIs carry a large
      volume of data per second and are intended for medium and large
27    enterprises, while the Basic Rate Interface ("BRI") standard is
      capable of carrying a smaller volume of data per second and is
28    intended for home and small enterprise use.

1   via wire transfer for Saint Gobain's service bill,
2   however, the payment was not received.   Linkline's loss
3   from the Saint Gobain account was $3,237.00.

4      29.   Also on August 8, 2006, O'Neal positively identified
5   Louis Arriola from a photo lineup as the person who said he was
6   Gordon Schmitt, and who set up an account with Linkline using the
7   company name Saint Gobain.   O'Neal said this was the same person
8   with whom he spoke at telephone number (213) 281-1024 and provided
9   the e-mail address "gschmitt@stgobaininc.com."

**_Victim TNCI Provides Service for "Gordon Schmitt" at Suite I_**

   30.   On July 17, 2006, SA Buenaluz spoke by telephone on a
conference call with Ed Ariel, Director of Risk Management for
TNCI, and Charles Luca, Vice President of Operations for TNCI,
who told him the following:

a.   In March 2006, TNCI entered into a service contract with
    a person who claimed to be Schmitt of Saint Gobain.
    Schmitt provided TNCI with telephone number (213) 281-
    1024 and e-mail address "gschmitt@stgobaininc.com" as his
    contact information. TNCI was also given the name John
    Glassel as an additional contact person for Saint Gobain
    at (213) 210-1706.

b.   TNCI installed telecommunications service at Suite I at
    the N. Third Ave office complex in Upland, as requested
    by Schmitt.

c.   In June 2006, a partial payment in the amount of $3,200
    was made by Schmitt to TNCI via WAMU and Western Union
    money orders, to cover activation fees for the
    telecommunications service.

14

d. On July 5, 2006, Ariel contacted Schmitt by telephone regarding unusually high international long distance call volume appearing on Saint Gobain's service. Schmitt told Ariel that the high call volume was only temporary.

e. In an e-mail communication from Schmitt during the week of July 10, 2006, Schmitt assured Ariel that the volume of call traffic would eventually go down and payment would be sent to TNCI.

f. In a July 13, 2006 e-mail from John Glassel, at "jglassel@stgobaininc.com," to Ariel and copied to Schmitt, at "gschmitt@stgobaininc.com," Ariel was informed a check was shipped via FedEx (with FedEx tracking number 857856799662) to pay for Saint Gobain's July 2006 bill. Ariel said he checked FedEx's Internet website for the status of the FedEx package and saw it was shipped on July 12, 2006.

g. TNCI decided to maintain active service to the Saint Gobain account through the weekend of July 15-16 since they believed payment was being made. Consequently, a large volume of call traffic was routed through the Saint Gobain service account over that weekend resulting in additional loss to TNCI.

h. On July 17, 2006, Ariel received the FedEx package from Saint Gobain, supposedly containing a check, and discovered it was empty except for a blank sheet of paper.

i. TNCI immediately terminated service to the Saint Gobain account when the FedEx package was received, realizing

1  they had not been paid for telecommunications services

2  provided, which at that point was estimated at over $1

3  million.

4     j.   Ariel tried to contact Schmitt at the contact telephone

5  number (213) 281-1024 and e-mail address

6  "gschmitt@stgobaininc.com," but was unsuccessful.

7     31. On July 18, 2006, Ariel forwarded to SA Buenaluz copies

8  of documents and WAMU money orders sent to TNCI by Schmitt. SA

9  Buenaluz examined the documents and observed the following:

10     a.   TNCI received three $1000 WAMU money orders (numbers

11  070707757, 070707758, and 070707759) and two $100 money

12  orders (WAMU money order number 070707764 and Western

13  Union money order number 08-408018521).

14     b.   A scanned copy of the FedEx Express U.S. Airbill packing

15  slip, FedEx tracking number 857856799662, from the

16  package Ariel received from Saint Gobain the previous

17  day.

18     32. Between June 30, 2006 and October 4, 2006, SA Buenaluz

19  spoke with and received surveillance photographs from Linda

20  Kristman, WAMU Investigator, and learned the following:

21     a.   The $1000 WAMU money orders (numbers 070707757,

22  070707758, and 070707759) and the $100 money order

23  (number 070707764) were purchased with funds drawn from

24  WAMU account number XXXX-XXXXXXX618-4, held in the name

25  of Qualitytel.

26     b.   On June 22, 2006, at 4:58 P.M., these money orders were

27  purchased at a WAMU branch located in Rancho Cucamonga,

28  California, approximately 22 miles from the Dill Circle

16

1    address.

2    c.   WAMU surveillance photographs captured Louis Arriola
3         purchasing all four of the WAMU money orders sent to
4         TNCI.

5    33.  Subsequent investigation provided additional information
6    regarding the FedEx package sent to TNCI by Schmitt on July 12,
7    2006, supposedly containing a check for payment of Saint Gobain's
8    bill, but actually containing only one blank sheet of paper.   On
9    July 21, 2006, SA Buenaluz spoke with John Gragg, FedEx Kinko's
10   Corporate Security, regarding surveillance video for persons
11   shipping a package bearing FedEx tracking number 857856799662, and
12   conducting business on July 12, 2006 at the FedEx Kinko's location
13   on Foothill Boulevard, in Rancho Cucamonga, California 91730. Gragg
14   told SA Buenaluz he was able to recover surveillance video for the
15   transaction which captured two individuals completing the
16   transaction to ship the package.

17   34.  On July 25, 2006, SA Buenaluz met with Gragg and reviewed
18   the surveillance video.   They observed Louis Arriola and another
19   male complete the transaction to ship the FedEx package to TNCI.
20   *Identity Theft Victim Gordon R. Schmitt and Saint Gobain*

21   35.  On June 26, 2006, SA Buenaluz was contacted by e-mail and
22   telephone by representatives of several telecommunications
23   companies, including Ceres Fagan of TelePacific, regarding
24   fraudulent service contracts established using the applicant
25   company name Saint Gobain Corporation.

26   36.  From June 26, 2006 through August 2006, SA Buenaluz
27   contacted representatives of eight telecommunications companies,
28   Access One Inc. ("Access One"), Airespring Inc. ("Airespring"),

17

Linkline, MPower Communications Corporation ("Mpower"), Lightyear Network Solutions ("Lightyear"), Verizon, TNCI, and Netifice Communications ("Netifice"), and learned the following:

a. Since February 2006, individuals posing as representatives of Saint Gobain, and in particular impersonating Schmitt, Saint Gobain's Vice President of Information Technology, submitted applications for and received telecommunications service resulting in a loss of approximately $1.5 million to the victim providers.

b. These individuals provided several physical addresses in the fraudulent telecommunications contracts, including an address on North Third Ave, Suite I, in Upland, California 91786.

c. Contact names and phones numbers included: Schmitt at (213) 281-1024 and "gschmitt@stgobaininc.com," as well as, John Glassel at (213) 210-1706 and "jglassel@stgobaininc.com."

37. On July 10, 2006, SA Buenaluz spoke with the true Schmitt, Vice President of Information Technology for Saint Gobain, who told him the following:

a. Schmitt had never entered into any telecommunications service contracts for any Saint Gobain service locations in Upland, California.

b. Schmitt was aware of instances earlier in 2006 where individuals used his name, title, and company information for Saint Gobain in applying for telecommunications service. Schmitt specifically did not apply for telecommunications service from these companies.

18

38. Also on July 10, 2006, Bob Wilk, Vice President of Business Practices and Compliance Programs for Saint Gobain, provided SA Buenaluz with information of service applications submitted with several telecommunications companies, and forwarded documentation submitted with the fraudulent applications to him by e-mail and attachments. Wilk confirmed the applications and other information he sent to SA Buenaluz were not submitted by the real Schmitt or any other authorized representatives of Saint Gobain. SA Buenaluz reviewed and learned the following from the e-mails and attachments:

a. A one page document titled "Credit Information," bearing Saint Gobain's copyrighted symbol, the headquarters address for Saint Gobain, federal tax identification number, and Data Universal Numbering System (DUNS) number, were submitted by Schmitt and the other individuals presenting themselves as representatives of Saint Gobain.

39. Continuing on or about July 10, 2006, SA Buenaluz spoke with Wilk by telephone, who told him the following:

a. Neither Saint Gobain, nor any of its authorized representatives, entered into any of the previously identified fraudulent contracts.

b. Saint Gobain does not have offices on N. Third Ave, Suite I, in Upland, California 91786.

c. Saint Gobain has no employees or other authorized representatives named John Glassel.

d. The telephone numbers (213) 281-1024, (213) 327-5592, and (213) 210-1706 are not used by Schmitt or anyone else at

19

1    Saint Gobain.

2    e.    The e-mail address "gschmitt@stgobaininc.com" is not used
3          by Schmitt or anyone else at Saint Gobain.

4    40.    On August 10, 2006, SA Buenaluz spoke with Bob Wilk and
5    Teresa T. Ciccotelli, Divisional Counsel, Saint Gobain.   They told
6    him the following:

7    a.    The Federal TIN used by the individuals impersonating
8          Saint   Gobain   representatives   to   apply   for   the
9          telecommunications service is a genuine TIN assigned to
10         one of Saint Gobain's subsidiary companies.

11   b.    The DUNS number also used by the persons posing as Saint
12         Gobain    representatives    to    apply    for    the
13         telecommunications service, and used on the one page
14         Credit Information sheet submitted with the fraudulent
15         service applications and lease applications, is a genuine
16         DUNS number assigned to one of Saint Gobain's subsidiary
17         companies.

18   41.    On September 5, 2006, SA Buenaluz again spoke with the
19   true Schmitt regarding photographs of Arriola he previously sent to
20   him, who told him the following:

21   a.    Schmitt did not recognize the person appearing in the
22         photographs.

23   b.    Schmitt did not know anyone named Louis Arriola.

24   c.    Schmitt did not give permission for anyone named Louis
25         Arriola to use his name or enter into any agreements or
26         contracts using his name.

27   / / /

28   / / /

*Financial Analysis of the Bank Accounts*

42.   On or about January 2006 and continuing through October 2006, SA Buenaluz received records from the State of California Employment Development Department (EDD), WAMU, Golden, and the California Secretary of State, and learned the following:

    a.   Louis Arriola registered a company named Qualitytel in 2003.

    b.   Louis Arriola was self-employed as president of Qualitytel.

    c.   With the EDD, Qualitytel, at the Dill Circle address, was identified as the employer of both Louis Arriola and Sharlene Arriola.

    d.   Louis Arriola's residence, the Dill Circle address, was listed as Qualitytel's business address on financial institution and California Secretary of State records.

43.   From bank records obtained from WAMU through the USSS's investigation, the following information was obtained regarding WAMU account XXXX-XXXXXXX618-4, ("the Qualitytel account"):

    a.   The account was held in the name of Qualitytel.

    b.   Louis R. Arriola was listed as president and the contact person for the account.

    c.   Sharlene Everitt Arriola was listed as a signatory for the account.

    d.   The address listed for the account was the Dill Circle address.

    e.   No other addresses were identified on the Qualitytel account.

    f.   Wyn International ("Wyn") and LCR providers, including

21

companies associated with Frontline Communications Int'l, Inc., ("Frontline"), Medcom LLC ("Medcom"), Universal Gateway ("Universal"), paid Arriola of Qualitytel, for telecommunications service.

44. SA Buenaluz reviewed information of deposits made to the Qualitytel account in 2006 and observed the following:

    a.  Medcom paid Arriola $64,981.00 which was deposited in the Qualitytel account.

    b.  Universal paid Arriola $433,152.81 which was deposited in the Qualitytel account.

    c.  Wyn paid Arriola $129,489.76 which was deposited in the Qualitytel account.

    d.  Mel Cooper, Frontline CEO, paid Arriola $50,000.00 which was deposited in the Qualitytel account.

45. From February 2006 through October 2006, Louis and Sharlene Arriola wrote 36 checks to themselves, totaling $56,873.99, from the Qualitytel account. These checks were deposited into Golden account XXXXXX9240 ("Golden account").

46. During the month of August 2006, Sharlene Arriola transferred $152,000.00 from the Qualitytel account to WAMU account XXX-XXX248-8 ("the Arriola checking account").

47. On August 16, 2006, Sharlene Arriola wrote a check totaling $5,000.00, drawn on the Qualitytel account and made payable to Jadyn Arriola. The check had "2159507 – Altura" on the memo line, and it was stamped on the back "Altura Credit Union, For Deposit Only." The check was also endorsed with the name, "Jadyn Arriola, Dep only, 2159507." This account is believed to be Altura account number XXX9507 ("the Altura account").

1    established the Golden account, held in the name of "Sharlene and
2    Louis Arriola."   Between February 1, 2006 and October 10, 2006, 36
3    checks totaling $56,873.99 drawn from the Qualitytel account,
4    written payable to Louis Arriola and/or Sharlene Arriola, were
5    deposited into the Golden account.

6    *The Arriola Checking Account*

7        52.   On January 17, 2001, Sharlene Arriola established the
8    Arriola checking account, held in the name of "Sharlene Arriola."
9    During August 2006, two transfers totaling $152,000.00 drawn from
10   the Qualitytel account were made into the Arriola checking account.

11   *The Altura Account*

12       53.   On August 16, 2006, one check totaling $5,000.00 drawn
13   from the Qualitytel account, written payable to Jadyn Arriola, was
14   deposited into the Altura account, held in the name of "Jadyn
15   Arriola."

16       54.   Based upon the facts set forth above, Plaintiff alleges
17   that the defendant bank funds represent or are derived from
18   proceeds traceable to violations of 18 U.S.C. §§ 1343 (wire fraud),
19   1341 (mail fraud), and/or 1028(a)(7) (identity theft), or a
20   conspiracy to commit one or more of those offenses.   Each of these
21   offenses constitutes "specified unlawful activity" pursuant to 18
22   U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B).   The defendant bank funds
23   are therefore subject to forfeiture pursuant to 18 U.S.C. §
24   981(a)(1)(C). The government further alleges that the defendant
25   bank funds were involved in monetary transactions involving
26   proceeds of the above referenced statutes, which transactions were
27   designed to promote the carrying on of specified unlawful activity,
28   or to conceal or disguise the true nature, source, location,

1   ownership or control of the proceeds in violation of 18 U.S.C.

2   § 1956(a)(1)(i) and (B), thus providing a separate basis for

3   forfeiture under 18 U.S.C. § 981(a)(1)(A).

4       WHEREFORE, the United States prays that due process issue to

5   enforce the forfeiture of the defendant bank funds, due notice be

6   given to all interested parties to appear and show cause why

7   forfeiture should be not be decreed, that this court decree

8   forfeiture of the defendant bank funds to the United States of

9   America for disposition according to law, and for such other and

10  further relief as this court may deem just and proper, together

11  with the costs and disbursements of this action.

12  DATED: April 24, 2008          THOMAS P. O'BRIEN
                                   United States Attorney
13                                 CHRISTINE C. EWELL
                                   Assistant United States Attorney
14                                 Chief, Criminal Division
                                   STEVEN R. WELK
15                                 Assistant United States Attorney
                                   Chief, Asset Forfeiture Section
16
17                                 P. GREG PARHAM
                                   Special Assistant United States Attorney
18                                 Asset Forfeiture Section

19                                 Attorneys for Plaintiff
                                   United States of America

20

21

22

23

24

25

26

27

28

                              25

1                                VERIFICATION

2          I, John C. Darrow, hereby declare that:

3          1.    I am a Special Agent with the U.S. Secret Service and am

4    the case agent for the forfeiture matter entitled United States v.

5    $180,920.46 Various Bank Funds.

6          2.    I have read the above Verified Complaint for Forfeiture

7    and know its contents.  It is based upon my own personal knowledge

8    and reports provided to me by other law enforcement agents.

9          3.    Everything  contained  in  the  Complaint  is  true  and

10   correct, to the best of my knowledge and belief.

11         I declare under penalty of perjury that the foregoing is true

12   and correct.

13         Executed April 23, 2008 in Los Angeles, California.

14

15

16

17                                      John C. Darrow

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Percy Anderson and the assigned discovery Magistrate Judge is Alicia G.  Rosenberg.

The case number on all documents filed with the Court should read as follows:

## CV08- 2703 PA (AGRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)       NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>United States of America | DEFENDANTS<br>$180,920.46 in Various Bank Funds |
|---|---|
| (b) County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases): | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):<br>Los Angeles |
| (c) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>THOMAS P. O'BRIEN, United States Attorney<br>P. GREG PARHAM, Special Assistant United States Attorney<br>United States Attorney's Office, California Bar No. 140310<br>U.S. Courthouse, 14th Fl., 312 N. Spring St., Los Angeles, CA 90012 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes  ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No        ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
18 U.S.C. §§ 981 (a)(1)(A) & (C)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | | ☑ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☑ No  ☐ Yes

If yes, list case number(s):

**FOR OFFICE USE ONLY:**     Case Number: _____     CV08-02703

CV-71 (07/05)                              CIVIL COVER SHEET                              Page 1 of 2

 

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

VIII(b).  RELATED CASES:  Have any cases been previously filed that are related to the present case? ☑No   ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply) ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
　　　　　　　　　　　　 ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
　　　　　　　　　　　　 ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
　　　　　　　　　　　　 ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

IX.  VENUE: List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)
☑ Check here if the U.S. government, its agencies or employees is a named plaintiff.
　　Los Angeles

List the California County, or State if other than California, in which EACH named defendant resides. (Use an additional sheet if necessary).
☐  Check here if the U.S. government, its agencies or employees is a named defendant.
　　Los Angeles

List the California County, or  State if other than California, in which EACH claim arose.  (Use an additional sheet if necessary)
Note: In land condemnation cases, use the location of the tract of land involved.
　　Los Angeles

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _P. Geo(arton_____   Date __4/24/08__

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |